IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. _____ |
| v. | : | DATE FILED: _____ |
| THOMAS TEDROW | : | VIOLATIONS: |
| | | 18 U.S.C. § 371 (conspiracy to commit securities fraud and wire fraud – 1 count) |
| | : | 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b–5 (securities fraud – 1 count) |
| | : | |
| | : | 18 U.S.C. § 1343 (wire fraud – 1 count) |
| | | 18 U.S.C. § 2 (aiding and abetting) |
| | : | Notice of forfeiture |

**INFORMATION**

<u>COUNT ONE</u>

THE UNITED STATES ATTORNEY CHARGES THAT:

<u>Relevant Individuals and Entities</u>

At all times material to this Information:

1. Defendant THOMAS TEDROW ("TEDROW") was a resident of Winter Park, Florida.

2. First Power and Light LLC ("FPL") was a Delaware limited liability company with its principal place of business in Bridgeport, Pennsylvania. FPL was formed in approximately July 2012. Person #1 was the nominal president of FPL. FPL was a solar installation and sales company. In or about April 2015, FPL changed its name to Volt Solar LLC, incorporated in Maryland with an address maintained in Bridgeport, Pennsylvania.

3. First Power and Light Inc. ("FPL Inc.") was incorporated in the State of Florida on or about July 1, 2013. FPL Inc. had an office in Bridgeport, Pennsylvania. Person #1 was the nominal president of FPL Inc. Unlike FPL, FPL Inc. was a solar power company in name only, with no active business or contracts.

4. Jerome Wenger ("Wenger"), charged elsewhere, exercised control over FPL and FPL Inc.

5. Kona Jones Barbera ("Barbera"), charged elsewhere, was a stock promoter and a resident of Hendersonville, North Carolina, and Locust Valley, New York. Barbera, who was not a licensed Financial Industry Regulatory Authority ("FINRA") investment broker, promoted penny stock companies using various business names under his control, including Quantum Financial Investments ("QFI"), in which Barbera was a co-owner.

6. Person #2 was a co-owner of QFI and a resident of Thornwood, New York, and Boca Raton, Florida, who worked at QFI in Glen Cove, New York, promoting stocks. Person #2 was not a licensed FINRA investment broker.

7. Neoterra Enterprises, LLC ("Neoterra") was a New York limited liability company with its principal place of business in Woodstock, New Jersey. Neoterra was formed in 2010. Barbera was the principal of Neoterra. Neoterra had no known legitimate business purpose.

8. J.E. Consulting Corp. ("J.E. Consulting") was a New York corporation with its principal place of business in Thornwood, New York. J.E. Consulting was formed in 2012. Person #2 was the principal of J.E. Consulting. J.E. Consulting had no known legitimate business purpose.

9. Person #3 and Person #4 together owned and operated Program Funding Advisors LLC ("PFA"), a Delaware limited liability company with its principal place of business in Old Brookville, New York. PFA was formed in approximately January 2012. Person #5, the spouse of Person #4, was the president of PFA. PFA was in the business of advising businesses on how to promote stock.

10. Mainstream Entertainment Inc. ("MSEI") was a Florida corporation with its principal place of business in Orlando, Florida. MSEI was formed in approximately June 2008. MSEI is now known as Volt Solar Systems, Inc.

11. Resort Savers, Inc. ("Resort Savers") was a Nevada corporation with reported business locations in the State of Washington and the People's Republic of China.

### The Federal Securities Laws and SEC Rules and Regulations

12. Initially, the shares of MSEI were "restricted" pursuant to statute and rules and regulations promulgated by the Securities and Exchange Commission ("SEC"). The SEC was an independent agency of the United States government charged by law with preserving honest and efficient markets in securities. The federal securities laws, regulations, and rules were designed to ensure that the financial information of publicly traded companies was accurately recorded and disclosed to the investing public.

13. The MSEI shares were restricted in the sense that they could not be resold in the public market. Restricted securities are, generally, securities acquired in unregistered, private sales. If one wishes to sell restricted securities to the public, certain conditions must, generally, be met, including having current information about the issuing company available to the public. In order to have the restriction removed, Wenger enlisted the services of Person #6, a

lawyer, who agreed to issue a false opinion letter to the effect that certain conditions had been satisfied for the removal of the restriction.

### The Conspiracy

14. From at least in or about April 2012, through at least in or about September 2016, in the Eastern District of Pennsylvania and elsewhere, defendant

**THOMAS TEDROW**

together and with others known and unknown to the United States, conspired to commit offenses against the United States, namely:

(a) securities fraud, that is, unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and the facilities of national securities exchanges, to employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b–5, by: (i) employing devices, schemes and artifices to defraud; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the purchase and sale of a security, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b–5; and

(b) wire fraud, that is, knowingly and with intent to defraud, to devise, and to intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and to cause certain wire communications to be transmitted in interstate and foreign commerce, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

15. The purpose of the conspiracy was to defraud investors by selling them shares in MSEI and Resort Savers at artificially inflated prices.

### Manner and Means

16. In or about 2012, defendant THOMAS TEDROW introduced Wenger to Person #7, a self-proclaimed reverse merger guru. Person #7 was interested in selling MSEI, a company that was owned by Person #7's son, Person #8. On or about September 20, 2012, FPL executed a stock purchase agreement, whereby it became the majority shareholder of MSEI for $50,000. Related to this transaction, Wenger also received 50 million shares of MSEI.

17. Thereafter, Wenger distributed the 50 million shares of MSEI. Among other things, Wenger distributed 35 million shares to his girlfriend, Person #9, so that he could maintain control over the company. Wenger also distributed 7.5 million shares to defendant THOMAS TEDROW and defendant TEDROW's two sons, Christian Tedrow, charged elsewhere, and Tyler Tedrow, charged elsewhere. The remaining 7.5 million shares were

distributed by Wenger to his associates and to employees of his companies, including Person #10 and Person #11.

18. After Wenger distributed the 50 million shares of MSEI and had the restriction lifted, he directed certain of the shareholders (to whom he had distributed the shares) to engage in the trading of their shares in the public market for the purpose of "pumping" the price of the stock of MSEI. The conspirators used manipulative stock trading techniques to fraudulently inflate the price of MSEI stock.

19. Wenger also enlisted the services of Person #3 and Person #4, as well as their company, PFA, to promote the stock. PFA, Person #3, and Person #4, in turn, directed Barbera and Person #2 to operate what is known as a "boiler room," in which, among other things, Barbera, Person #2, and other co-conspirators, known and unknown to the United States, cold-called potential investors, for the purpose of getting them to buy shares of MSEI. Among other things, Barbera and Person #2 received undisclosed commissions for selling shares of MSEI, which they directed to be paid to QFI, Neoterra, and J.E. Consulting.

20. Defendant THOMAS TEDROW and Wenger directed the drafting of false and fraudulent press releases and other communications relating to MSEI and its parent company, FPL, for the purpose of convincing the investing public that FPL and MSEI had more business and were more valuable than they, in fact, were, and to inflate the price of the stock of MSEI. In addition, defendant THOMAS TEDROW, Tyler Tedrow, and Christian Tedrow created and disseminated false and fraudulent press releases and prepared and disseminated a Form 8-K securities disclosure filed with the SEC on or about February 8, 2013, all as part of the conspiracy to fraudulently inflate the price of the common stock of MSEI.

21. Once the stock price of MSEI had been inflated or "pumped," Wenger instructed others to sell their shares of stock of MSEI, allowing them to keep a portion of the illicit proceeds for themselves, while transferring the remaining illicit proceeds to Wenger and his companies, all at Wenger's direction.

22. In addition, defendant THOMAS TEDROW and his sons, Tyler Tedrow and Christian Tedrow, sold their shares of MSEI, whether individually or through Sterling LLC, now known as Waterford Sterling LLC ("Sterling"), a limited liability company controlled by defendant THOMAS TEDROW and Tyler Tedrow.

23. In all, defendant THOMAS TEDROW received approximately $160,957 in illicit proceeds (at least some of which were obtained through Sterling) from sales of MSEI stock.

24. In or around May 2014, defendant THOMAS TEDROW met with Person #7, and Person #7 asked defendant TEDROW to provide a fraudulent marketing package for Resort Savers, in exchange for money to be paid to defendant TEDROW. Defendant TEDROW agreed and received approximately $5,250.

Overt Acts

In furtherance of the conspiracy and to accomplish its objects, defendant THOMAS TEDROW, Wenger, Person #3, Person #4, Person #7, and others known and unknown to the United States committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

1. On or about November 23, 2012, defendant THOMAS TEDROW sent an e-mail message discussing steps to be taken with respect to the manipulation of MSEI securities.

2. On or about November 30, 2012, defendant THOMAS TEDROW sent an e-mail message discussing steps to be taken to conceal, with respect to MSEI, the involvement of individuals subject to industry disbarments.

3. On or about March 17, 2014, defendant THOMAS TEDROW sent an e-mail message to Wenger regarding a potential audit.

4. In or about May 2014, defendant THOMAS TEDROW met with Person #7 regarding Resort Savers.

In violation of Title 18, United States Code, Section 371.

## COUNT TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. Paragraphs 1–13 and 16–24 and the Overt Acts of Count One of this Information are realleged and incorporated by reference as though fully set forth herein.

2. From at least in or about April 2012, through at least in or about September 2016, in the Eastern District of Pennsylvania and elsewhere, defendant

## THOMAS TEDROW

did unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and the facilities of national securities exchanges, employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b–5, by: (i) employing devices, schemes and artifices to defraud; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the purchase and sale of a security.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b–5.

## COUNT THREE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. Paragraphs 1–13 and 16–24 and the Overt Acts of Count One of this Information are realleged and incorporated by reference as though fully set forth herein.

### The Scheme

2. From at least in or about April 2012, through at least in or about September 2016, defendant

**THOMAS TEDROW**

devised and intended to devise a scheme to defraud investors in Mainstream Entertainment, Inc., n/k/a Volt Solar Systems, Inc., and Resort Savers, Inc., and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

### Manner and Means

3. The United States realleges and incorporates by reference Paragraphs 16 through 24 of Count One of this Information as a description of the manner and means of the scheme.

### The Wire

4. On or about May 17, 2014, in the Eastern District of Pennsylvania and elsewhere, defendant

**THOMAS TEDROW**

for the purpose of executing the scheme described above, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce the signals and

sounds, to wit an interstate wire e-mail from defendant THOMAS TEDROW (in the State of Florida) to Wenger (in the Eastern District of Pennsylvania) regarding a potential audit.

In violation of Title 18, United States Code, Sections 1343 and 2.

## NOTICE OF FORFEITURE

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

1. As a result of the violations of Title 18, United States Code, Sections 371 and 1343, and Title 15, United States Code, Sections 78j(b) and 78ff, defendant

**THOMAS TEDROW**

shall forfeit to the United States of America any property that constitutes, or is derived from, proceeds traceable to the commission of such offenses, including, but not limited to, the sum of approximately $166,207.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

for *[signature]*
_____
**WILLIAM M. McSWAIN**
**UNITED STATES ATTORNEY**